In the Matter of Robert D. BERKE, Bankrupt.

No. 69 B 343.

United States District Court, E. D. New York.

Oct. 6, 1972.

RE, Judge: *

This is a petition to review an order of the Referee in Bankruptcy which sustained certain objections to the discharge of the bankrupt, and ordered that the discharge be denied.

Robert D. Berke, a salesman, was adjudicated a bankrupt on his voluntary petition filed on April 17, 1969. Bankruptcy Act, § 18.f. The case was referred to a Referee in Bankruptcy. Bankruptcy Act, § 22.a. The list of the bankrupt's creditors which he filed with his petition, as required by § 7.a.(8) of the Bankruptcy Act, shows that he was required to seek relief under that Act because he had personally guaranteed the obligations of Prime Knits, Inc., a corporation in which he held a one-third stock interest, and which failed financially.

Ralph Heyman, Esq., was appointed trustee in bankruptcy. Bankruptcy Act, § 44.a. On November 9, 1970, the trustee in bankruptcy filed with the Referee in charge of the case twenty four specifications of objections to discharge. After a lengthy trial, the Referee in Bankruptcy sustained the objections numbered I through V, inclusive. The other objections were either not sustained or were withdrawn by the trustee. On October 27, 1971, having sustained objections to the discharge of the bankrupt, the Referee in Bankruptcy made an order which provided that the discharge of Mr. Berke be denied. Bankruptcy Act, § 14.c.(1). It is this order which is now before the court on this petition to review. Bankruptcy Act, § 39.a.(8).

The first four specifications of objections to discharge relate to the bankrupt's transactions pertaining to a one-family residence located at 3 Woodland Gate, Syosset, New York. The fifth objection to discharge relates to the bankrupt's treatment of an income tax refund in the sum of $1,339.57.

Specifications I and V accuse Mr. Berke of the commission of offenses punishable by imprisonment, as provided

Chester A. Lessler, New York City, for bankrupt.

Hahn, Hessen, Margolis & Ryan, New York City, for trustee, by William R. Fabrizio, New York City, of counsel.

* Judge, U.S. Customs Court, sitting by designation.

under Title 18, United States Code, Section 152. Specifically, he is accused of the knowing and fraudulent concealment from the trustee in bankruptcy of property belonging to the estate of the bankrupt, viz., an interest in the real estate located at 3 Woodland Gate, Syosset, New York, and the income tax refund in the sum of $1,339.57. Specification II accuses Mr. Berke of knowingly and fraudulently omitting from the schedule of his property an interest in that real estate. Specification III alleges that the bankrupt further violated Title 18, U.S.C. § 152, in that, in contemplation of his bankruptcy proceedings, he knowingly and fraudulently transferred his interest in premises 3 Woodland Gate to his parents. Specification IV alleges that that transfer of real property to the bankrupt's parents was made with intent to defeat the bankruptcy law, knowingly and fraudulently.

■ *In limine,* on this petition to review the order of the Referee in Bankruptcy pursuant to Section 39.c. of the Act, it is appropriate to refer to the scope of the review. This is not a trial de novo; the question is not what this court would have found on the evidence which was before the Court of Bankruptcy. In Re Cox, 244 F.Supp. 430 (W.D.Mo.1965). The "clearly erroneous" rule applies by virtue of the express mandate of General Order 47. "[T]he judge shall accept (the referee's) findings of fact unless clearly erroneous." See, 2 Collier on Bankruptcy, ¶39.28 (14th ed. 1967).

■ It should be noted that if the presumption of correctness, and the "clearly erroneous" rule were to make findings of fact conclusive, judicial review would be a mere empty right. Judicial review, however limited in scope, must be meaningful. As has been stated by Justice Reed, in an analogous situation "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947). The presumption of correctness, however, which applies to a referee's findings of fact, does not apply to his conclusions of law. In Re Dejay Stores, Inc., 220 F.Supp. 497 (S.D.N.Y.1963).

A statement of the essence of the clearly erroneous rule is a simple matter. Its application is often difficult and complex. It has been said that, "[o]f course, with regard to the findings of law or the application of a legal standard to fact . . ., this Court is in no wise bound by the Referee's decision." In Re Anjopa Paper & Board Manufacturing Co., 269 F.Supp. 241, 250 n. 3 (S.D.N.Y.1967).

Little can be added to Judge Friendly's scholarly discussion of the nuances of the clearly erroneous rule found in In Re Hygrade Envelope Corp., 366 F.2d 584 (2d Cir. 1966). In the present case the court is of the opinion that the review of the Referee's order is uniquely analogous to the question presented in In Re Hygrade Envelope Corp., where Judge Friendly, at page 588, stated:

> "To be sure, an appellate court must respect findings of the trial judge as to what in fact happened and in addition should give due weight to his superior opportunity to acquire the true feel of the case, . . . . But when the issue is his application of a legal standard to facts undisputed or reasonably found, reversal is not limited to results that are 'clearly erroneous'; it is enough that the appellate court should be convinced . . . that the result does not jibe with the applicable rule of law.[4]"

In footnote 4 of that opinion, Judge Friendly stated further:

> "Although reversal in such a case could often be deemed justified under the principle that the 'unless clearly erroneous' rule does not protect when the reviewing court has 'the definite and firm conviction that a mistake has been committed,' United States v.

United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746 . . . clarity is promoted by recognizing that the application of a legal standard to the facts is not a 'finding of fact' within the rule."

The court, in the case at bar, is of "the definite and firm conviction that a mistake has been committed" and "that the result does not jibe with the applicable rule of law."

In this petition for review where "conclusions of law" are in reality findings of fact, they will be treated as factual findings rather than legal conclusions.

The Referee's findings of fact and conclusions of law, pertinent to the objections to discharge which were sustained, are as follows:

### Findings of Fact

1. On the 17th day of April, 1969, Robert D. Berke filed a voluntary petition in bankruptcy in this Court and was adjudicated bankrupt on that day.

2. In September 1961, the bankrupt purchased a one family dwelling located at 3 Woodland Gate, Syosset, New York. Title was taken in the name of the bankrupt and his wife, Rhoda Berke. The purchase price was $22,000. of which $14,000. was paid in cash above an existing mortgage in the sum of $8,000.00 held by the Dime Savings Bank. (S.M. p. 45).

3. At the time of his purchase of his dwelling the bankrupt borrowed the sum of $10,000. from his father Ben Berke, which was used as part of the cash down payment.

4. No note or other documentary evidence of this loan was not [sic] given by the bankrupt to his father. (S.M. p. 14).

5. The bankrupt paid his father interest on the aforesaid loan at the rate of 4½% to 5% per month by checks in sums of $37.50 to $42. (S.M. pp. 294–298, 343–346, Exh. E).

6. In or about March 29, 1968, Ben Berke obtained a check in the sum of $6000. from Rose Stern, his mother-in-law and endorsed it over to the bankrupt. (S.M. p. 12).

7. The bankrupt claims this $6000. was an additional loan from his father. (S. M. pp. 10–15).

8. By deed dated March 29, 1968, and recorded in the Nassau County Clerk's Office on April 8, 1968, one year and nine days prior to the filing of the voluntary petition in bankruptcy herein, the bankrupt and his wife, conveyed their interest in their home to his parents, Ben and Beatrice Berke.

9. At all times from September 1961 through this date, the bankrupt and his wife resided and continues [sic] to reside in the property, making all payments for maintenance and repairs of the dwelling, (S.M. pp. 153–156) except payments of principal and interest on the first mortgage and insurance premiums which were made by Ben Berke.

10. At the time of the transfer of the property, as aforesaid, the bankrupt was indebted to various persons in an amount in excess of $150,000. (S.M. pp. 161, 162, 261, 262, 263).

11. The consideration and reason for the transfer of the real property by the bankrupt and his wife to his parents were as testified to by the bankrupt:– (S.M. pp. 136–137).

"The Referee: What was the reason for executing this deed?

The Witness (bankrupt): Well, the original $10,000.00 loan, Your Honor, when the house was purchased in 1961, plus the fact that my parents also loaned me more money after the business had gone bankrupt, and I didn't have a job for about three months— in other words, there was a total sum of $16,000.00 that I was indebted to them for.

The Referee: But why did you execute this deed?

The Witness: Well, my father and mother wanted to be protected because I was in bankruptcy or the business had gone into bankruptcy, and I probably had to declare personal bankruptcy, so they wanted their

**330**

monies loaned from them to me to be protected. In other words, I told them, you know, that the $10,000.00—I asked them to loan me an additional sum of $6000.00 because I had bills and everything to pay, and that in return for that my wife and I would turn over the deed to the house to them."

12. Ben Berke, bankrupt's father, testified (S.M. pp. 322–323) as follows:—

"By the Referee:

Q. Well, at the time that you gave him the $6,000.00 until you got the deed, you were aware of the fact that he had a lot of creditors at that time, were you not?

A. Yes, sir.

Q. Was it your intention to take this property and hold it for your son?

A. Not for my son, no.

Q. Suppose he gave you back the $16,000.00 then what would happen to the house?

A. Then it would be his house again.

Q. Then you would give him back the house in that event; is that correct?

A. Yes, that is right.

Q. In other words, was it your intention and his intention to see if he could save the house from other creditors of his?

A. It was my intention to get the house as far as I am concerned.

Q. And to have a place for your son and his family to live; is that correct?

A. That is right.

Q. And you wanted to make sure that none of his creditors would be able to take the house away from your son and daughter-in-law, did you?

A. I didn't think of that particular point at the time.

Q. Well, that's what would have happened if he had a lot of creditors and he didn't pay them; is that correct?

A. I [sic] would have, yes."

13. And Ben Berke further testified (S.M. p. 325):—

"Q. What was it which resulted in your getting this deed on March 29, 1968?

A. Well, as far as I know he was already out of work, and he needed money to live on, and I figured the best thing to do was to get the deed."

14. The aforesaid transfer was made as security for the moneys owing by bankrupt to his father, Ben Berke.

\*   \*   \*   \*   \*   \*

20. The bankrupt and his wife filed a joint federal income tax return for the year 1968 in which they requested a refund in the sum of $1493.57.

21. The bankrupt's wife had no income by way of employment or otherwise in the year 1968.

22. On or about May 19, 1969, the bankrupt and his wife received a [sic] income tax refund check from Internal Revenue Service in the sum of $1339.57 which they endorsed, cashed, and spent the proceeds in payment of real estate taxes on their dwelling, repairs to the house, insurance premiums and nursery school fees.

23. The trustee applied for an order directing the bankrupt to turn over to him the proceeds of the income tax check, and after a hearing therein, an order was duly made directing the sum of $1369.60 be paid over to the trustee. (The amount of the check was actually $1339.57.)

The order provided, in part:—

"5. All income reported by said tax return was received only by the bankrupt and no part thereof was received by the bankrupt's wife, Rhoda Berke.

8. Said tax refund of $1369.60 constituted property of the estate of the bankrupt.

9. Petitioner as trustee of the bankrupt was entitled to possession of the said property.

11. The bankrupt knowingly diverted the said tax refund of $1369.60 from petitioner as trustee."

24. The sum of $1339.57 was eventually paid over to the trustee by the bankrupt.

*Conclusions of Law*

1. I conclude that the conveyance by the bankrupt and his wife of premises 3 Woodland Gate, Syosset, New York to his father and mother, Ben and Beatrice Berke, by deed dated March 29, 1968 and recorded April 8, 1968 was not an absolute conveyance but was executed and delivered as security for the bankrupt's debt to his father, Ben Berke.

2. I conclude that the aforesaid transfer was knowingly and fraudulently made by the bankrupt to conceal his interest therein from his creditors, and that he continued to have an interest in the house.

3. I conclude that in knowingly and fraudulently failing to disclose in his schedules of assets and liabilities filed herein his interest in the aforesaid property he made a false oath.

\* \* \* \* \* \*

6. The bankrupt fraudulently concealed his interest in the income tax refund in the sum of $1339.57 from the trustee in failing to disclose it as an asset in his schedules of assets and liabilities filed herein and in using the proceeds of the income tax refund check upon receipt thereof from the Internal Revenue Service.

■ A close scrutiny of the entire record of the proceedings before the Referee fails to reveal any substantial evidence from which one could reasonably conclude that the bankrupt committed those acts with which he is charged in the specifications which were sustained. The evidence does not show that a subsequent retransfer by the father would be pursuant to any agreement or understanding with the son. Any such transfer would therefore not be as a result of any legal obligation, but rather pursuant to an unexpressed manifestation of love and affection.

With respect to the bankrupt's residence, it is shown that a little more than one year prior to the filing of the petition in bankruptcy, the bankrupt and his wife conveyed their interest in their residence to the bankrupt's parents to satisfy antecedent debts. This was a preferential transfer. Bankruptcy Act, § 60a, b. The Referee has found that the bankrupt was in debt to his father at the time of the transfer in a substantial amount. The only evidence which tended to support the trustee's theory was the testimony extracted under the questioning of the Referee in Bankruptcy and contained in findings of fact 11 through 13, inclusive. This testimony showed only that Ben Berke, the bankrupt's father, harbored an unexpressed intention to take title to the house so that his son and daughter-in-law might have a roof over their heads while the son was in dire financial straits, and to return it to them should his son, in the future, be able to repay the $16,000 obligation to the father. No evidence at all was adduced which would prove that the son was aware of his father's benign intention. The transfer was not kept secret. Aside from the close family relationship, none of the "badges of fraud" tainted the transaction.

The evidence shows that the transfer was absolute, and unburdened by any understanding or agreement for a retransfer. In the traditional language of the courts, the transfer was not for mere "fair" consideration, but for an "adequate" consideration. See § 67, sub. d(1, 2) Bankruptcy Act; Cohen v. Sutherland, 257 F.2d 737 (2d Cir. 1958); See also Myers v. Fultz, 124 Iowa 437, 100 N.W. 351 (1904). Cf. N.Y. Debtor and Creditor Law, McKinney's Consol.Laws, c. 12, § 272. The proven facts, and the reasonable inferences to be drawn from them, are woefully inadequate to support the Referee's inference or "conclusion of law" that the transfer of the real property by the bankrupt and his wife to the bankrupt's parents was done with fraudulent intent. The proven facts, and the reasonable inferences to be drawn therefrom, cannot sustain the Referee's "findings of law" that the bankrupt knowingly and fraudulently concealed from the trustee an interest in his resi-

dence (specification I); that he knowingly and fraudulently omitted from the schedule of his property any interest in that real estate (specification II); and that Mr. Berke, in contemplation of his bankruptcy proceedings, knowingly and fraudulently transferred his interest in his residence with specific intent to defeat the bankruptcy law (specifications III and IV).

A careful reading of the entire record shows that the transaction pertaining to premises 3 Woodland Gate, Syosset, New York, was completely innocent. A debtor-son intended to, and in fact did, make a preferential transfer to his creditor-father. This preferential transfer would have been vulnerable under Section 60 of the Bankruptcy Act only if it had been within four months of the initiation of a proceeding under the Act. The record proclaims clearly the parties' innocence of any fraud. Their actions are easily explainable by their relationship. Furthermore, it is axiomatic that fraud will not be lightly inferred.

The Referee drew improper inferences from the testimony of the bankrupt and his father, which is quoted in his findings of fact. It would seem natural for a father, in the circumstances presented, to entertain a desire to provide a proper home for his son. It would seem equally natural to restore title to his son at some future time should his son's financial condition improve. The future possibility that the bankrupt's parents might restore title to him, on repayment of the indebtedness, is analogous to the probability that their son would inherit the property from them on their demise. The natural and commendable feelings of affection of the parents cannot be converted into the fraud which is the substance of the accusations contained in specifications I through IV.

The record is likewise devoid of any factual basis to sustain the Referee's findings and conclusions pertaining to the alleged concealment from the trustee in bankruptcy of property belonging to the estate, the income tax refund of $1,339.57. The Referee did not expressly find that the bankrupt knew that the check dated May 19, 1969 was the "property" of the estate which passed by operation of law to the trustee in bankruptcy, nor could he so find on the evidence. Bankruptcy Act, Section 70a. The check was made payable to the bankrupt and to his wife. The interest of a trustee in bankruptcy in such an income tax refund is anything but clear. 4a Collier on Bankruptcy (14th ed. 1967) ¶ 70.18, page 222, note 43j. The record is barren of any facts from which it could be found that the bankrupt, a layman, had the requisite knowledge that he was in fact concealing from the trustee in bankruptcy property which belonged to the estate.

Congress designed the Bankruptcy Act to give a debtor an opportunity for a fresh start, and denial of a discharge in bankruptcy is a most punitive measure. In Re Ostrer, 393 F.2d 646 (2d Cir. 1968); In Re Tabibian, 289 F.2d 793 (2d Cir. 1961). The record before the Referee in this case lacks evidence of that quality which could serve as the foundation for his findings that the bankrupt committed criminal acts. His conclusion that the sanction of denial of discharge was appropriate is erroneous as a matter of law. On the entire record it must be found that the bankrupt has sustained his burden of proof that he did not commit the acts charged.

The order of the Referee in Bankruptcy is reversed with instructions to issue to the bankrupt a discharge in bankruptcy.

It is so ordered.